UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:13-cr-40052-SLD-JEH-2 |
| ) | |
| JULIO AYBAR and TEURY ) | |
| MARTINEZ-LARA, ) | |
| ) | |
| Defendants. | |

## ORDER

This matter comes before the Court on Defendant Teury Martinez-Lara's Motion to Suppress Evidence, ECF No. 39. Martinez-Lara requests that the Court suppress all physical evidence seized from inside the car he was driving when arrested on August 22, 2013, and all statements he allegedly made to FBI agents when in custody later that day. Mot. Suppress 1. For the following reasons, Martinez-Lara's Motion to Suppress Evidence is DENIED.

### BACKGROUND[1]

According to Detective Jeremy Raymond of the Warren County, Illinois, Sheriff's Department, sometime between approximately 11:00 am to noon on August 22, 2013, a Warren County dispatcher called to advise him that two individuals attempted to purchase gift cards with stolen credit cards from a Casey's General Store ("Casey's") in Viola, Illinois (Mercer County), and successfully used a stolen credit to make a purchase at the Casey's in Monmouth, Illinois (Warren County). Dispatch described the suspects as black males driving south in a silver

---

[1] The background is drawn from testimony at a June 25, 2014 suppression hearing unless otherwise noted.

1

Toyota with a Minnesota license plate bearing the number, EDG 4728.  Resp. to Mot. Suppress 2, ECF No. 41.

Raymond conveyed this information to Warren County Sheriff Martin Edwards, who also claims to have heard it from radio dispatch.  Edwards began looking for a silver vehicle containing two people with a matching license plate.  Based on a further report that the suspects may have gone south on U.S. Highway 67, Edwards travelled in that direction, heading to the Casey's store in Roseville, Illinois, which was the next sizable town south of Monmouth. Raymond and Mercer County Deputy Sheriff William Glancey—who was in Warren County that day to pursue a joint investigation in an unrelated case—also headed south down U.S. 67 in pursuit.

When Edwards reached the Casey's in Roseville, he said store employees met him in the parking lot, saying that "the car that was involved or that [he] was looking for" was heading south on U.S. 67.  Edwards continued south on U.S. 67 and came up on the rear of a silver vehicle that appeared to contain two black males.  At a distance, Edwards said, the license plate appeared to have a Minnesota plate's coloring, but he was focused on the number, which matched the reported number.  Edwards radioed the license plate number in to dispatch to confirm the match, reported that he was pulling over the suspect vehicle, and turned on his lights. The car—a silver Toyota Avalon with Pennsylvania plate number EDG 4728, Resp. to Mot. Suppress 2—pulled over onto the right shoulder of U.S 67, south of 40th Avenue, in Warren County.  Unlike a Minnesota plate, a Pennsylvania plate has a lime-green stripe covering the bottom 1/4 or 1/5 of the plate.  Edwards testified to familiarity with Minnesota license plates but not those of Pennsylvania.  He said he did not notice that the license plate was from Pennsylvania before initiating the traffic stop.

Shortly after Edwards pulled over behind the Toyota and climbed out of his vehicle, Raymond and Glancey arrived in response to his reported sighting, parked behind his vehicle, and also alighted. Drawing their weapons, the officers initiated what they termed a "felony traffic stop." From his positioning near or behind the driver-side door of his unmarked squad car, Edwards in English ordered the driver, later identified as Defendant Martinez-Lara, to leave the vehicle, turn around, and walk backward toward him. Raymond was positioned near Edwards, with Glancey standing next to Edwards' passenger-side door. According to Glancey, Martinez-Lara did not immediately comply, but after "a little bit of time," he did as instructed. Exiting the car hands first, he turned around and backed up; once Martinez-Lara drew near to Edwards, Raymond handcuffed his hands behind him and brought him to stand at the rear of Edwards' car. Although a pat-down search of Martinez-Lara "would have been" conducted, Raymond did not recall finding anything on the driver's person.

Next, the officers ordered the passenger, later identified as Defendant Julio Aybar, to exit the vehicle in like manner. According to Glancey, Aybar immediately exited the vehicle and began walking backwards; at one point, he began to turn, but ceased upon orders from the officers. As Aybar drew near to Edwards' squad car but before Glancey handcuffed him, Glancey said, Aybar started to reach toward his right hand pocket. Glancey ordered him to stop, grabbed him by his arm and handcuffed his hands behind his back. Glancey searched the pocket Aybar had reached for and conducted a general pat-down search. He testified that he found three gift cards in Aybar's right front pants pocket, a wallet, and possibly a cell phone—the officers' testimony is inconsistent on this point. Edwards eventually placed Aybar in his squad car.

While Glancey was searching Aybar, Edwards performed a brief search of the Toyota to ensure there was no one else, or any weapons, inside, he said. In doing so, he looked into the

open side pocket of the already-ajar driver's door, as well as at the center console. Edwards said he found some cards in the pocket and a pocket knife and GPS unit on the console.

Sheriff Edwards left with Aybar in his squad car while another officer who had arrived at the scene, from Illinois District 14, left with Martinez-Lara. Both men were taken to the Warren County Sheriff's Office in Monmouth. After Edwards left, Raymond—with Glancey looking on—conducted an inventory search of the vehicle. According to Raymond, sheriff's department policy provides for such a search to document any valuables in the car, because the car was to be impounded based on belief that it was used in the commission of a crime. Raymond testified to finding the following items in the passenger compartment: around 20 gift cards (Visa, Mastercard, and/or Green Dot), some loose about the passenger compartment of the car and some "wrapped up in a bag in the glove box"; approximately 60 American Express credit cards bearing the name "Douglas Hernandez," some loose, some contained in a tape-sealed envelope, and some wrapped up similar to the gift cards, found underneath the passenger seat; two cellular telephones found on either the floor or the open center console; and paperwork, some electronic devices, and a GPS. Raymond took everything of apparent evidentiary value out of the car and back to his office, where he later created an official inventory. At the scene, he noted the locations of some the items on paper, but threw the paper away after incorporating the notes into his inventory. FBI Special Agent Samantha Maxwell later conducted an additional search of the vehicle and electronic devices found therein pursuant to a federal search warrant. Resp. to Mot. Suppress 3–4.

Under contract with local police, Jack Wilson of Ryner's Tire, Auto and Towing towed the Toyota to his secure building in Monmouth. He held the Toyota there until authorities requested that he release it to a rental car agency. After towing the Toyota to his shop in order to

release it, Wilson asked the sheriff's department if he should check through the car first, as was his usual practice, and was told he could. Wilson said he did so, and discovered two stacks of credit cards, each contained in an envelope wrapped with rubber bands and stuffed deep inside the driver's and front-passenger seats, respectively. He turned these over to police.

Federal authorities were brought into the investigation following the traffic stop on August 22, 2013. Later that day, FBI Agents Maxwell and Jose Munoz questioned Martinez-Lara in an unrecorded session at the Warren County Sheriff's Department office in Monmouth. Maxwell had asked Munoz, fluent in Spanish, for aid in questioning Martinez-Lara, a Spanish speaker not conversant in English. Munoz said he spoke with Martinez-Lara and Maxwell took notes. The agents were identifiable as law enforcement officers by Munoz's FBI badge and Maxwell's vest; while armed, they did not make any weapons visible during the interrogation, according to Munoz.

Munoz said he read a Spanish Notification of Rights and Consent form, describing the *Miranda* rights, to Martinez-Lara, then handed it to Martinez-Lara so he could read it for himself. Munoz said he asked Martinez-Lara, who appeared to Munoz to read the form to himself, whether he understood, and Martinez-Lara responded in Spanish that he did. Munoz said Martinez-Lara then signed the form in his presence. Munoz said he did not inquire as to Martinez-Lara's level of education or reading capability.

Munoz said he asked Martinez-Lara to tell his side of the story, and he did so. Toward the end of the 30 to 40 minute interview, he asked Martinez-Lara if he was involved in any other court proceedings. Martinez-Lara mentioned having legal representation in a case pending in Pennsylvania "involving a woman." According to Munoz, Martinez-Lara never requested to speak with that attorney, nor did he ever tell the agents he did not want to answer their questions.

5

On September 25, 2013, a grand jury returned a two-count indictment charging Martinez-Lara and Aybar with (1) conspiring to use and possess counterfeit and unauthorized access devices and (2) possession of 15 or more counterfeit and unauthorized access devices, in violation of 18 U.S.C. §§ 2, 1029(a)(1)–(3), 1029(b)(2), 1029(c)(1)(A)(i). Indictment, ECF No. 8. On June 4, 2014, Martinez-Lara moved to suppress all physical evidence seized from the Toyota and his statements to the FBI agents on August 22, 2013. Mot. Suppress 1. At the June 25, 2014 hearing on this motion, Martinez-Lara's counsel requested that the Government produce the notes taken by FBI Agent Maxwell during Martinez-Lara's interrogation. The Court ordered the Government to produce those notes, and all other outstanding discovery material, to Martinez-Lara by July 1, 2014. The Court directed Martinez-Lara's counsel to notify the Court on July 2, 2014, after looking at the notes, whether he would rest or supplement his Motion to Suppress. No supplement was filed; accordingly, the Court's examination of Defendant's Motion to Suppress is limited to the evidence and argument adduced in the parties' filings and the June 25, 2014 hearing.

## DISCUSSION

Martinez-Lara argues that the physical evidence must be suppressed as fruit of a warrantless arrest and vehicular search that each violated the Fourth Amendment. Mot. Suppress 2–3. Additionally, Martinez-Lara argues that his statements during the interrogation should be excluded because they were made involuntarily in violation of his Fifth Amendment rights. *Id.* at 4.

**I. Legitimacy of the Stop and Arrest**

Martinez-Lara argues that Edwards' initial stop of the silver Toyota violated the Fourth Amendment because Edwards lacked reasonable suspicion that its occupants were engaged in

criminal conduct. Mot. Suppress 2. Additionally, Martinez-Lara argues that the officers lacked probable cause to arrest him. *Id*.

**A. Legal Standard**

An arrest violates the Fourth Amendment unless the arresting officer has probable cause to detain the individual. *United States v. Askew*, 403 F.3d 496, 506–07 (7th Cir. 2005). Law enforcement officers may utilize brief, investigatory stops without probable cause so long as they have "reasonable suspicion based on articulable facts that a crime is about to be or has been committed." *United States v. Carlisle*, 614 F.3d 750, 754 (7th Cir. 2010) (citations omitted). Reasonable suspicion is a less demanding standard than probable cause but still requires more than a mere hunch. *United States v. Swift,* 220 F.3d 502, 504 (7th Cir. 2000). A court must look at the totality of the circumstances in light of the individual officers' experience and training. *United States v. Williams*, 731 F.3d 678, 683–84 (7th Cir. 2013). The court should uphold the investigatory stop "if it finds that 'the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing.'" *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

Probable cause exists if the facts and circumstances within the officer's knowledge at the time of the arrest suffice "to warrant a prudent person, or one of reasonable caution" to believe that the suspect has or is about to commit a crime. *Jones v. City of Elkhart*, 737 F.3d 1107, 1114 (7th Cir. 2013) (quoting *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012)). There need only be a probability or substantial chance of criminal activity, not a preponderance of evidence showing its existence. *Thayer*, 705 F.3d at 246. Probable cause "is a fluid concept that relies on the common-sense judgment of the officers based on the totality of the circumstances." *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006).

7

**B. Analysis**

Edwards stopped Martinez-Lara's car on the basis of circumstances substantially matching the report he received of subjects engaged in a criminal counterfeit credit card scam. The Toyota's location—heading southbound on U.S. 67 within an area the suspects could reasonably have reached after attempting fraudulent purchases at northern Casey's stores just minutes earlier—and its appearance—a silver car operated by two males with darker complexions—matched the dispatch report. So did the license plate number, which Edwards verified with dispatch before pulling Martinez-Lara over. The match was not perfect: Martinez-Lara's car sported Pennsylvania plates when the report indicated Minnesota tags, which, although marked by many similarities, lack Pennsylvania's lime-green color bar. However, the similarities to the dispatch report that Edwards observed, including the character-for-character license plate number match, created a sufficient "particularized and objective basis" to connect Martinez-Lara to the credit scam suspect reports. *See Tilmon*, 19 F.3d at 1224. Edwards therefore had reasonable suspicion to stop the silver vehicle.

Similarly, the facts apparent to the officers when they arrested Martinez-Lara indicated a "substantial chance" that he was involved in criminal activity. *Thayer*, 705 F.3d at 246. Most salient are the matching vehicle description, number and gender of suspects, general geographical location, and identical license plate number connecting Martinez-Lara to credit card scam reports made by the various Casey's employees. *See, e.g., Maniscalco v. Simon*, 712 F.3d 1139, 1144 (7th Cir. 2013) (finding probable cause to arrest for disorderly conduct where the suspect's car, license plate, and physical appearance matched the victim's report); *Tilmon*, 19 F.3d at 1228 (finding probable cause to arrest where the suspect's physical appearance, albeit in different clothing, and "distinctively marked car" matched the reported bank robber). In

8

addition, after securing the Toyota's occupants, the officers observed loose credit and gift cards in plain view in the car, further implicating its occupants in the particular criminal activity reported. Under these circumstances, a "prudent" person of "reasonable caution" could easily believe that Martinez-Lara was involved in the reported fraudulent credit card activity. *See Jones*, 737 F.3d at 1114. Accordingly, probable cause existed to arrest him.

## II. Legitimacy of Vehicular Search

Martinez-Lara contends that the officers' warrantless search of the silver Toyota violated the Fourth Amendment because it qualified for neither the inventory search nor the search-incident-to-arrest exceptions to the general warrant requirement, and was conducted without probable cause to believe that the vehicle contained contraband. Mot. Suppress 3.

### A. Legal Standard

As a search incident to arrest under the Fourth Amendment, police may search a vehicle absent a warrant "only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search," or when it is "reasonable to believe evidence relevant to the crime of offense might be found in the vehicle." *Arizona v. Gant*, 556 U.S. 343 (2009). Under the so-called "automobile exception" to the warrant requirement, however, police need only probable cause to believe the vehicle contains contraband or evidence of illegal activity to justify its search without a warrant. *United States v. Washburn*, 383 F.3d 638, 641 (7th Cir. 2004). Probable cause to search exists "where there is a fair probability that an officer will find contraband or evidence of illegal activity at a specified location based on a totality of the circumstances." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). A vehicle search justified by probable cause may extend to any part of the vehicle in which evidence or contraband may be concealed. *United States v. Ledford*, 218 F.3d 684, 688 (7th Cir. 2000).

### B. Analysis

Whether analyzed under the Fourth Amendment's search-incident-to-arrest or automobile exceptions, the officers' search of the Toyota after taking its passengers into custody was valid given the officers' reasonable basis to believe the car contained evidence of the crime of arrest. *See Gant*, 556 U.S. at 343; *Washburn*, 383 F.3d at 641. The reasons justifying arresting Martinez-Lara on suspicion of participation in the fraudulent credit card activity at the various Casey's stores, coupled with the visibility of multiple credit or gift cards—instrumentalities of the alleged crime—in the passenger compartment, indicated more than a "fair probability" that the Toyota contained evidence of that crime. *See Washburn*, 383 F.3d at 641. Martinez-Lara does not argue, and no evidence suggests, that any officer searched a compartment in the Toyota that could not have concealed credit or gift cards. *See Ledford*, 218 F.3d at 688. Because the officers' search was therefore valid under the search-incident-to-arrest and automobile exceptions to the warrant requirement, the Court need not decide whether it also constituted a valid inventory search.

## III. Voluntariness of Statements Under the Fifth Amendment

Martinez-Lara contends that his statements to FBI Agents Munoz and Maxwell were involuntary and thus obtained in violation of the Fifth Amendment. Mot. Suppress 3.

### A. Legal Standard

To safeguard an individual's Fifth Amendment protection against self-incrimination, law enforcement officers must precede custodial interrogations with *Miranda* warnings. *United States v. Hampton*, 675 F.3d 720, 726 (7th Cir. 2012). As the Supreme Court explained:

> Prior to any questioning, the [accused] must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or

> appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

*Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966). A signed *Miranda* waiver form and undisputed testimony that the form was read to and by a defendant, and that he said he understood it, raises a presumption of a valid waiver that the defendant must then rebut. *United States v. Springer*, 460 F.2d 1344, 1349 (7th Cir. 1972). A statement may still be found involuntary under a totality of the circumstances despite a valid *Miranda* waiver. *United States v. LeShore*, 543 F.3d 935, 941 (7th Cir. 2008).

If a suspect invokes his right to counsel, police must cease questioning him until counsel has been provided, unless the suspect initiates further communication with police. *Hampton*, 675 F.3d at 726 (citing *Edwards v. Arizona*, 451 U.S. 484–85 (1981)). To invoke the Fifth Amendment protections, a suspect "'must assert the privilege rather than answer if he desires not to incriminate himself'; otherwise, a decision to answer is considered voluntary." *United States v. Swanson*, 635 F.3d 995, 1001 (7th Cir. 2011) (quoting *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984)). Invocation of the right to counsel must be objectively unambiguous, however. *Hampton*, 675 F.3d at 727. Police may continue questioning without violating the Fifth Amendment "if the suspect's reference to counsel is 'ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel.'" *Id.* at 726 (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)).

If a suspect has already invoked his *Miranda* right to counsel, police may not interrogate him about even an unrelated offense absent counsel or the suspect's initiation of the dialogue. *United States v. McKinley*, 84 F.3d 904, 908–09 (7th Cir. 1996) (citing *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991)). The Sixth Amendment separately guarantees a right to counsel in

criminal proceedings, but that right is offense-specific—it does not prohibit police from interrogating the suspect in the absence of counsel about an unrelated offense. *Id.* at 908–09. In that context, the suspect must separately, clearly request counsel under *Miranda* in the unrelated interrogation. *Id.* at 908–10.

### B. Analysis

Munoz testified that, at the outset of the interrogation, he read Martinez-Lara a litany of rights conforming to the *Miranda* standard in Spanish and gave Martinez-Lara the document to read. Martinez-Lara appeared to read it, and when Munoz asked if he understood his rights as outlined in that notice-and-consent form, Martinez-Lara said he did and signed his name on the form. Martinez-Lara has introduced no evidence to the contrary. The undisputed evidence therefore creates a presumption that Martinez-Lara validly waived his rights under *Miranda*, a presumption he has failed to rebut. *See Springer*, 460 F.2d at 1349.

Additionally, there is no evidence that Martinez-Lara at any point indicated reticence in answering any questions Munoz posed to him in the absence of an attorney. At 30 to 40 minutes, the interview was relatively brief, and there is no evidence of coercive environmental factors that would cause the Court to question the voluntariness of Martinez-Lara's statements under a Fifth Amendment totality of the circumstances inquiry. *See LeShore*, 543 F.3d at 941.

While Munoz testified that Martinez-Lara mentioned his legal representation in the unrelated Pennsylvania case, Martinez-Lara has produced no evidence that he invoked his *Miranda* right to counsel in that case, or that it was even criminal in nature. *See McKinley*, 84 F.3d at 908. Further, there is no evidence that he unambiguously requested assistance of that or any counsel during the August 22, 2013 interrogation. *See id.* at 909. Any implication to the contrary that Martinez-Lara now may try to read into his mention of his Pennsylvanian attorney

clearly does not rise to the level of an unequivocal request for legal assistance. *See Hampton*, 675 F.3d at 727; *McKinley*, 84 F.3d at 909. The evidence supports the finding that Martinez-Lara knowingly and intelligently waived his *Miranda* rights and voluntarily told his story, and did not make an unequivocal request for counsel in this or any other case. His statements were therefore not obtained in violation of the Fifth Amendment.

## CONCLUSION

Defendant's Motion to Suppress Evidence, ECF No. 39, is DENIED.


Entered this 11th day of July, 2014.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE
